## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| MICHAEL F. EARLE, and | ) | |
| CARLA EVANS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:18-cv-697-GMB |
| | ) | |
| THE BIRMINGHAM BOARD OF | ) | |
| EDUCATION, and LISA HERRING, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

Pending before the court are Defendants' Motions for Summary Judgment. Docs. 33 & 36. Plaintiffs Michael F. Earle and Carla Evans filed this suit against Defendants Lisa Herring and the Birmingham Board of Education. Doc. 1. Plaintiffs assert a Title VII race discrimination claim, a Title VII gender discrimination claim, and 42 U.S.C. § 1981 and § 1983 race discrimination claims against the Birmingham Board of Education. Doc. 11. Plaintiffs assert a Fourteenth Amendment race discrimination claim and a Fourteenth Amendment gender discrimination claim against Herring. Doc. 11. Pursuant to 28 U.S.C. § 636(c), the parties have consented to the jurisdiction of a United States Magistrate Judge. After consideration of the parties' submissions, the applicable law, and the record as a whole, the court finds that Motions for Summary Judgment (Docs. 33 & 36) are due to be GRANTED.

# I.  JURISDICTION AND VENUE

The court has subject-matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331.  The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations to support both.

# II.  STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "The purpose of summary judgement is to separate real, genuine issues from those which are formal or pretended." *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of material fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  In responding to a properly supported

motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Indeed, the nonmovant must "go beyond the pleadings" and submit admissible evidence demonstrating "specific facts showing that there is a genuine [dispute] for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

When a district court considers a motion for summary judgment, it "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the nonmovant." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citation and internal quotation marks omitted). The court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd. of Pub. Ed. for Bibb County*, 495 F.3d 1306, 1315 (11th Cir. 2007) (citation omitted). Importantly, if the nonmovant "fails to adduce evidence which would be sufficient

. . . to support a jury finding for [the nonmovant], summary judgment may be granted." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted).

## III.  FACTUAL BACKGROUND

Resolving all factual inferences in favor of Earle and Evans, the nonmovants, the facts are as follows.

The Birmingham Board of Education (the "Board") hired Keiff Smith on January 1, 1990. Doc. 35-7 at 81.  Smith, a black man, was hired as a field representative for the Community School Project S.O.A.R. Docs. 35-7 at 83 & 35-8 at 12.  In 2001, he voluntarily transferred to a security officer position. Doc. 35-8 at 3.  In 2003, Smith received a voluntary transfer from security officer to attendance officer. Doc. 35-7 at 83.  Attendance officers were paid substantially more than security officers. Doc. 35-8 at 3.  His pay grade as an attendance officer was classified as 69-5. Doc. 35-5 at 3.  In 2007, Smith received an involuntary transfer back to a security officer position. Doc. 35-8 at 3.  Due to a company policy, Smith's salary was not reduced, and he continued to be paid at the 69-5 pay grade. Docs. 35-8 at 18 & 35-5 at 3–4.  In 2011 and 2012, Smith's annual salary was around $58,000. Doc. 35-5 at 4.  On May 9, 2012, the BOE temporarily assigned Smith to a dispatch position. Doc. 35-8 at 24.  Again, his pay grade remained the same. Docs. 35-8 at 24 & 35-1 at 11–12.  Eventually, he returned to his post as a security officer. Doc. 35-

8 at 38. From 2013 through 2017, Smith's annual salary was between $60,470 and $64,168. Doc. 35-5 at 4. In 2018, his pay grade changed to 62-16, reducing his salary to $50,128. Doc. 35-5 at 3.

Prior to 2008, the Board allowed involuntarily transferred employees to retain their salary if they were transferred to a lower paying position. Doc. 35-7 at 83. In 2008, the Board implemented a new policy requiring that employees be paid according to the salary schedule for the position they occupied regardless of whether the employee changed positions voluntarily and whether the new position had a lower salary than the previous position. Doc. 35-7 at 83. However, the Board's policy was intended to apply prospectively only. Doc. 35-8 at 4. The policy also provided that it "shall not be applied in a manner that would result in the violation of any special agreements or settlement agreements to which the Board is a party, or any court orders." Doc. 35-7 at 84.

In June 2012, due to fiscal mismanagement, the State of Alabama assumed control of the Board's financial operations. Doc. 35-8 at 5. The State required the Board to implement a reduction-in-force in 2012 and a salary schedule realignment in 2013. Doc. 35-8 at 5. The purpose of the salary realignment was to bring all employees' salaries into conformity with the pay grade applicable to the position the employee actually worked. Doc. 35-8 at 5. Plaintiffs Earle and Evans argue that Smith was not affected by this policy. Doc. 43 at 5. Defendants explain that some

employees, like Smith, were inadvertently missed in the first round of salary conversion. Doc. 35-8 at 5.  Smith then posed a legal challenge to his salary reduction. Doc. 35-8 at 6.  After the resolution of the legal challenge, Smith's salary was adjusted on November 26, 2018 and his salary was reduced. Doc. 35-4 at 8 & 94; Doc. 35-8 at 6.  Smith resigned in January 2019. Doc. 35-8 at 38.

The Board hired Earle as a security officer in 1984. Doc. 35-1 at 4.  Earle is a white man. Doc. 35-1 at 5.  In his deposition, Earle testified that his job duties have not changed since 1984 and that he is essentially doing the same job now as when he was initially hired. Doc. 35-1 at 4.  Earle's salary has increased slightly over the years, but he has remained at the same pay grade, 62-16. Doc. 35-5 at 1–2.  From October 2013 through October 2016, Earle's annual salary was $48,200. Doc. 35-5 at 1–2.  Starting in October 2016, Earle made $50,128 per year. Doc. 35-5 at 1–2.

The Board hired Evans as a part-time employee in 1996. Doc. 35-2 at 3.  She became a full-time security officer in 1998. Doc. 35-2 at 3.  Evans is a white woman. Doc. 35-7 at 81.  In 2011, Evans' annual salary was $46,997. Doc. 35-5 at 73.  In 2012, Evans' annual pay was $47,225. Doc. 35-5 at 73.  In October 2013, Evans' salary increased to $48,200. Doc. 35-5 at 73.  Beginning in October 2016, Evans made $50,128 per year. Doc. 35-5 at 73.  Despite her salary growth, Evans' remained at a pay grade of 62-16 during her entire employment as a security officer. Doc. 35-5 at 73.

In 2007, Earle and Evans first complained to their supervisor that Smith was being paid more for the same work. Docs. 35-2 at 6 & 35-1 at 23. Their supervisor indicated that he was aware of the discrepancy and was attempting to rectify it. Doc. 35-2 at 6. After a few months passed, Evans again asked her supervisor about the issue. Doc. 35-2 at 7. The supervisor indicated that the Chief Financial Officer told him "he better leave it alone, it was a done deal, that he would get rid of the department if all this started . . . causing problems." Doc. 35-2 at 7. In 2013, the Board appointed a new supervisor to the security department. Doc. 35-7 at 85. Evans and Earle again complained to this supervisor, but nothing changed. Doc. 35-2 at 7. Soon afterwards, a third supervisor was assigned to the security department. Doc. 35-1 at 6. Evans and Earle again complained about the pay disparity, and the third security department took the issue to a Board member who indicated that the Board would not address it. Doc. 35-1 at 6. That supervisor eventually departed as well. Doc. 35-1 at 6. The next supervisor in the security department arrived in 2014. Doc. 35-7 at 85. Once again, Earle and Evans complained about the pay gap, but the Chief Financial Officer admonished this supervisor to leave the issue alone. Doc. 35-2 at 8–9. In 2016, a fifth supervisor replaced the fourth. Doc. 35-7 at 85. Also in 2016, Earle and Evans contacted an Alabama Education Association representative. Doc. 35-1 at 6. On January 11, 2017, they filed a Grievance Report Form with the Board's attorney. Doc. 35-7 at 75. On April 3, 2017, Earle and Evans

filed EEOC charges. Doc. 1-1. Earle and Evans alerted Herring of the pay discrepancy in June 2017 at a grievance meeting convened by the Board. Doc. 35-2 at 16. They initiated this lawsuit on May 4, 2018. Doc. 1. As mentioned above, the Board adjusted Smith's salary on November 16, 2018.

## IV. DISCUSSION

### A. Race Discrimination Claims against the Board

The plaintiffs' Title VII, § 1981, and § 1983 race discrimination claims against the Board fail. [1] A plaintiff may use either direct evidence or circumstantial evidence to prove an intentional discrimination claim. *Alvarez v. Royal Atl. Dev., Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010). If plaintiffs opt to use circumstantial evidence, as they do here, the *McDonnell Douglas* framework traditionally applies. *Id.* To make out a *prima facie* case of racial discrimination under *McDonnell Douglas*, a plaintiff must show that (1) she belongs to a protected class; (2) she was qualified to do the job; (3) she was subjected to an adverse employment action; and (4) her employer treated similarly situated employees outside her class more favorably. *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). "Many articulations of the prima-facie case exist, but the essence of the prima-facie case is that the employee presents circumstantial evidence sufficient to generate a reasonable inference by the fact

---

[1] Claims brought under Title VII, § 1981, and § 1983 all require proof of discriminatory intent and all use the same analytical framework. *See Bryant v. Jones*, 575 F.3d 1281 n.20 (11th Cir. 2009).

finder that the employer used prohibited criteria in making an adverse decision about the employee." *Gibbons v. Auburn Univ. at Montgomery*, 108 F. Supp. 2d 1311, 1315 (M.D. Ala. 2000).

"[T]he plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by proving, among other things, that she was treated differently from another 'similarly situated' individual—in court-speak, a 'comparator.'" *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1217 (11th Cir. 2019). The plaintiff must demonstrate that she and her comparator were similarly situated in all material respects. *Id.* at 1218. Ordinarily, a similarly situated individual "will have engaged in the same basic conduct or misconduct as the plaintiff, will have been subject to the same employment policy, guideline, or rule as the plaintiff, will [] have been under the jurisdiction of the same supervisor as the plaintiff, and will share the plaintiff's employment or disciplinary history." *Oirya v. Auburn Univ.*, 2019 WL 4876705, at *17 (M.D. Ala. Oct. 2, 2019) (citing *Lewis*, 918 F.3d at 1227–28); *see also Menefee v. Sanders Lead. Co., Inc.*, 2019 WL 4466857, at *3 (11th Cir. Sept. 18, 2019). "Treating *different* cases differently is not discriminatory." *Lewis*, 918 F.3d at 1222–23. "An employer is well within its right to accord different treatment to employees who are differently situated in 'material respects'—*e.g.*, who engaged in different conduct, who were subject to different policies, or who have different work histories." *Id.* at 1228. For this reason, a "plaintiff and her comparators must

be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'" *Id.* (citing *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 231 (2015)).

Under the *McDonnell Douglas* framework, "if the plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action." *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008) (internal quotation and citation omitted). "The employer's initial showing, just as the plaintiff's, is a low bar to hurdle." *Flowers v. Troup County, Ga., Sch. Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015). "The burden placed on the employer is only an evidentiary one: a burden of production that can involve no credibility assessment, and that is exceedingly light." *Alexander v. Chattahoochee Valley Comm. College*, 325 F. Supp. 2d 1274, 1280 (M.D. Ala. 2004) (internal citation and quotation marks omitted).

"If the plaintiff makes out a *prima facie* case, and the employer articulates a legitimate, nondiscriminatory reason for the adverse action, then the plaintiff bears the burden of showing that the reason offered was merely pretextual." *King v. Sec'y, U.S. Dep't of the Army*, 652 F. App'x 845, 847 (11th Cir. 2016) (citing *Rojas v. Florida*, 285 F.3d 1339, 1342 (1th Cir. 2002)). "To establish pretext, a plaintiff must come forward and show, by a preponderance of the evidence, that the reason given by the employer was not the real reason for the adverse employment decision, but

was a pretext for discrimination." *Id.*

Here, Earle and Evans have not established a *prima facie* case of discrimination because Smith is not a proper comparator. The district court's analysis in *Gaines v. Cooper*, 2019 WL 2514935 (N.D. Ala. June 18, 2019), is instructive. In *Gaines*, the district court found that the plaintiff's proffered comparators were insufficient because the comparators had different work histories and were subject to different policies. *Id.* at *6. The plaintiff, Gaines, worked for the Alabama Department of Transportation ("ALDOT"). *Id.* at *1. Before he was hired, ALDOT created the Transportation Maintenance Technician ("TMT") position to replace the Highway Maintenance Technician ("HMT") position. *Id.* ALDOT required all TMTs to have obtained a Commercial Driver's License ("CDL"). *Id.* After the creation of the TMT position, HMTs with CDLs were classified as TMTs, and those without CDLs were classified as Transportation Workers. *Id.* New TMT hires were allowed a six-month probationary period in which to obtain a CDL. *Id.* at *2. Those who failed to obtain a CDL were discharged. *Id.* However, if ALDOT originally hired an employee in a position that did not require a CDL, and then promoted the employee to TMT, she was given the option to take a demotion and return to her original position. *Id.* ALDOT hired Gaines as a TMT and he was considered a good employee. *Id.* However, he failed to obtain his CDL and was eventually terminated. *Id.* at *3. Before his termination, Gaines

asked to be transferred to a Transportation Worker position, but ALDOT denied his request. *Id.* Gaines alleged that white employees were allowed to transfer to the Transportation Worker position when they did not obtain a CDL. *Id.* at *5.

Gaines' first proffered comparator was hired as an HMT and later reclassified as Transportation Worker when ALDOT phased out the HMT position. *Id.* at *5. This first comparator resigned in 2010 but was rehired as Transportation Worker and then promoted to a senior Transportation Worker position, which he held until resigning again in 2018. *Id.* The court determined that this was an improper comparator because he had a different employment history—notably, he was never a TMT like Gaines. *Id.* The court also recognized that this comparator began work under a different policy than the one in place when Gaines was hired. *Id.*

The second comparator was hired as laborer and then promoted to HMT. *Id.* This second comparator then resigned, but was rehired as a Transportation Worker. *Id.* Like the first comparator, the second comparator had a materially different employment history than Gaines. *Id.* He was never a TMT, he was never required to obtain a CDL, and he did not request to be transferred to a Transportation Worker position after failing the CDL test. *Id.*

The third comparator was hired as a laborer and promoted to HMT. *Id.* After ALDOT created the TMT position, the third comparator was reclassified as a Transportation Worker. *Id.* Like the others, the court found that this comparator had

a different employment history. *Id.*  She also was subject to a different policy than Gaines, and was found to be an invalid comparator. *Id.*

Ultimately, the court concluded that Gaines had not established a *prima facie* case of discrimination because he had not presented valid comparators who were similarly situated to him in all material respects. *Id.*  The court determined that the proffered comparators had materially different employment histories, and therefore they were not similarly situated to Gaines in all material respects. *Id.* at *6.  The court also noted that the first two comparators were subject to different work requirements than Gaines and that the third comparator was subject to a different work policy than Gaines. *Id.*

Likewise, in *Edwards v. Compass Bank*, 2019 WL 6701970, at *10 (N.D. Ala. Dec. 9, 2019), the court held that the plaintiff's failure-to-promote claim failed because the plaintiff did not present a comparator similarly situated in all material respects.  The *Edwards* plaintiff began working as a Talent Partner at Compass Bank in 2004 at a salary grade of 18. *Id.* at *1.  She started out in the retail line of the business and then moved to the risk line. *Id.*  Throughout her employment, the plaintiff applied for various same-seat[2] promotions and different positions. *Id.* at *1–

_____

[2] "A same-seat promotion 'occurs when an employee moves up from one grade level in a job hierarchy to the next salary grade level within the same job hierarchy while remaining in the same Position Control Number. . . . Same seat promotions are considered/recommended when the department has a recognized need for the new level of responsibilities, accountability, and performance required of the higher level job.'" *Edwards*, 2019 WL 6701970, n.5.

6. In 2017, Compass Bank launched the U.S. Talent & Culture Project-Based Organization ("PBO"). *Id.* at *2. The plaintiff and another employee, Orazio Mancarella, were assigned to the PBO. *Id.* The plaintiff remained at a salary grade of 18, but received variable compensation, benefits, and bonuses. *Id.* A couple of months after their transfer, Macarella was promoted to a salary grade of 20 because he was the "Scrum Master" for the PBO, which meant that he was responsible for defining the project's methodology. *Id.* In May 2017, a vacant Talent Partner position was posted. *Id.* at *3. Because the position was in the engineering line of business, in which the plaintiff had no experience, she was ineligible for this position and did not apply. *Id.* Brittany Hatcher received the job. *Id.* A salary grade 20 position was posted in June 2017. *Id.* The position's client base included corporate clients, like the Legal and Compliance Departments. *Id.* An external candidate with human resources experience, Tammy Fincher, was hired. *Id.* Again, the plaintiff did not apply for the position. *Id.* In September 2017, the plaintiff transferred from the PBO back to a retail position. *Id.* In January 2018, the plaintiff was promoted to a salary grade of 20. *Id.* The district court determined that Mancarella, Hatcher, and Fincher were not appropriate comparators. *Id*. at *10.

Mancarella was not an appropriate comparator because he had performed the "Scrum Master" role and the plaintiff had not. *Id.* at *9. The court found that this was a material difference that reasonably distinguished him from the plaintiff. *Id.*

The court determined that Hatcher was an inappropriate comparator because she had a different employment history than the plaintiff. *Id.* Unlike the plaintiff, who worked in the retail line of the business, Hatcher worked on the engineering side. *Id.* As for Fincher, the court also concluded that she had a different employment history from the plaintiff because she had prior experience providing human resources services to corporate clients and the plaintiff did not. *Id.* Due to the different employment histories, the court concluded that the plaintiff could not present a *prima facie* case of discrimination to support her failure-to-promote claim. *Id.* at *10. *See also Brown v. Synovus Fin. Corp.*, 783 F. App'x 932, 930 (11th Cir. 2019) ("None of [the plaintiff's] colleagues constitute comparators because they occupied different positions, had different certifications, or worked for different supervisors than [the plaintiff].")

And so it is here. As in *Gaines* and *Edwards*, where the comparators and the plaintiffs had dissimilar employment histories, both Earle and Evans have materially different employment histories from Smith. *Gaines*, 2019 WL 2514935, at *6; *Edwards*, 2019 WL 6701970, at *10. Additionally, as in *Gaines*, where the comparators were subject to a different work policy than the plaintiff, Smith was subject to two policy provisions that never applied to Earle and Evans. *Gaines*, 2019 WL 2514935, at *5.

### 1. *Employment History*

Both Earle and Evans have materially different employment histories than Smith. Smith initially hired on as a field representative with Project S.O.A.R. Docs. 35-7 at 83 & 35-8 at 12. Earle and Evans began their full-time employment with the Board as security officers in 1985 and 1998, respectively. Docs. 35-1 at 4 & 35-2 at 3. Smith did not begin work as a security officer until 2001. Doc. 35-8 at 3. He then voluntarily transferred to an attendance officer in 2003, a position with a salary grade of 69-5. Doc. 35-7 at 83. He involuntarily transferred back to the security officer position in 2007. Doc. 35-8 at 3. On the other hand, Earle and Evans continued to work as security officers at the salary grade of 69-16. Docs. 35-5 at 1–2 & 35-5 at 73. Unlike Smith, after they became full-time security officers, Earle and Evans never received a promotion or change in position. Unlike Smith, Earle and Evans never gained experience as an attendance officer. Unlike Smith, Earle and Evans were not involuntarily demoted. In other words, Smith, Earle, and Evans do not share the same employment history. Accordingly, as did the courts in *Gaines* and *Edwards*, this court concludes that Smith is not a proper comparator because his different employment history precludes a finding that he is similarly situated in all material respects. *See Gaines*, 2019 WL 2514935, at *6; *Edwards*, 2019 WL 6701970, at *10; *see also Lewis*, 918 F.3d at 1227–28 ("Ordinarily, for instance, a similarly situated comparator . . . will share the plaintiff's employment . . . history.").

## 2. Employment Policies

Smith's employment also has been affected by policy provisions that did not apply to Earle and Evans. *Lewis*, 918 F.3d at 1227–28 (finding that the same employment policy, guideline, or rule will support a valid comparison). The first such provision was the Board's policy allowing involuntarily transferred employees to retain their higher salary. Doc. 35-7 at 83. This policy explains why Smith was paid at a 69-5 pay grade, not a 62-16 pay grade, despite performing work as a security officer. When the Board altered this policy in 2008 to require employees to be paid consistent with their current position, it determined that the new rule would apply prospectively only. Doc. 35-8 at 4. Accordingly, Smith remained subject to the pre-2008 policy provision. Earle and Evans had not been involuntarily transferred before 2008, and therefore this policy did not apply to them.

The second policy that applied to Smith and not Earle and Evans involved special agreements. The Board's 2008 policy contained a provision stating that the policy "shall not be applied in a manner that would result in the violation of any special agreements or settlement agreements to which the Board is a party, or any court orders." Doc. 35-7 at 84. When Smith was temporarily assigned to be a dispatcher in 2012, the Board entered into a special agreement with him for his salary schedule to remain the same due to the temporary nature of the assignment. Doc. 35-8 at 4, 24. Earle and Evans never fell under this provision, because they never had

a special agreement with the Board. Because Earle, Evans, and Smith were not subject to the same policies, Smith cannot be a proper comparator. *See Gaines*, 2019 WL 2514935, at *5 ("Thus, these three individuals were not subject to the same policy as Gaines, which weighs against them being similarly-situated comparators."); *Lewis*, 918 F.3d at 1223 ("If an employer applies a rule differently to people it believes are *differently* situated, no discriminatory intent has been shown.") (internal citation omitted).

Without a proper comparator, Evans and Smith do not have a *prima facie* case of discrimination. *See Lewis*, 918 F.3d at 1231 ("[The plaintiff] must demonstrate— as part of her *prima facie* case—that she was treated differently from other individuals with whom she was similarly situated in all material respects."). Accordingly, the race discrimination claims against the Birmingham Board of Education cannot survive summary judgment.[3]

---

[3] Even if the court were to assume that Smith was a proper comparator from 2013 (when the Board implemented the salary schedule realignment) through 2018 (when the Board reduced Smith's salary), the Board has articulated legitimate, nondiscriminatory reasons for the pay disparity. The Board contends that Smith's salary was not reduced in 2013 because the Board initially missed Smith during the schedule realignment. Doc. 34 at 5. The Board asserts that "Smith succeeded in further delaying the alignment process for himself through protracted legal wrangling." Doc. 34 at 5. Plaintiffs have not shown that either reason is a pretext for discrimination. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) ("Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it"). Defendants are not required to provide a good reason for their decisionmaking, so long as the reason is not discriminatory. *See Chapman*, 229 F.3d at 1030 ("An employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is for not a discriminatory reason."). Without presenting any evidence of pretext, Plaintiffs cannot survive summary judgment. *See id.* at 1024–25 ("If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the

**B.      Gender Discrimination Claims against the Board**

For the reasons set forth above, Smith also is an improper comparator for Evans with respect to her gender discrimination claims.  Because Evans and Smith have different employment histories and were subject to different work policies, they are not similarly situated in all material respects.  Without a proper comparator, Evans cannot establish a viable gender discrimination claim. *Crawford*, 529 F.3d at 970.  Accordingly, her gender discrimination claims are due to be dismissed.

**C.      Fourteenth Amendment Claims against Herring**

Plaintiffs assert Fourteenth Amendment claims against Herring in her official capacity and in her individual capacity. Doc. 11.  Earle and Evans allege that Herring is liable for race discrimination and gender discrimination in their pay and conditions of employment. Doc. 11.  They also allege that Herring was indifferent to their complaints of discrimination. Doc. 11.  These claims are due to be dismissed.

**1.      *Official Capacity Claims***

Title 42 U.S.C. § 1983 imposes liability on any person who, under color of

---

defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment of the plaintiff's claim.").

Moreover, when a plaintiff relies on circumstantial evidence, the Eleventh Circuit has held that a "triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (internal quotation and citation omitted).  Earle and Evans have given no indication that they intend to travel under the convincing mosaic standard.  The court nevertheless has considered whether the evidence before it might present a convincing mosaic of circumstantial evidence that would allow a jury to infer discrimination, and concludes that it does not.

state law, deprives any citizen of the United States "of any rights, privileges, or immunities secured by the Constitution and laws[.]"  In this way, § 1983 provides citizens with the mechanism to enforce their individual rights guaranteed by the United States Constitution. *E.g.*, *Gonzaga Univ. v. Doe*, 536 U.S 273, 285 (2002); *Micklas v. Doe*, 450 F. App'x 856, 857 (11th Cir. 2012).  The same standards that apply in Title VII suits and § 1981 suits apply when a plaintiff attempts to establish an equal protection violation under the Fourteenth Amendment through § 1983. *Bryant*, 575 F.3d at 1296, n. 20 ("We pause to note that discrimination claims . . . brought under the Equal Protection Clause, 42 U.S.C. § 1981, or Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2, are subject to the same standards of proof and employ the same analytical framework.").  As in other contexts, it is not a violation of the equal protection clause to treat different people differently. *Lewis*, 918 F.3d at 1222–23 ("Treating *different* cases differently is not discriminatory, let alone intentionally so.") (internal citation omitted).

Once again, this claim fails because Smith is not a proper comparator for Earle and Evans.  Since Smith had a different employment history and was subject to different policy provisions than Earle and Evans, it was appropriate to treat him differently under the Fourteenth Amendment.  Without a proper comparator, Earle and Evans cannot establish an equal protection violation under the Fourteenth Amendment. *See, e.g.*, *Mills v. Cellco Partnership*, 376 F. Supp. 3d 1228, 1239

(N.D. Ala. 2019).  Accordingly, Herring is due summary judgment on the claims against her in her official capacity.

## 2.    *Individual Capacity Claims*

Qualified immunity offers complete protection from civil damages for government officials sued in their individual capacities. *See Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).  Defendants will be entitled to qualified immunity if their conduct does not violate "clearly established or constitutional rights of which a reasonable person would have known," *Hope v. Pelzer*, U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)), and they were acting within their discretionary authority. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).  Qualified immunity is not merely a defense against liability but rather immunity from suit, and the Supreme Court "repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009) (quotation marks and citations omitted).  To receive qualified immunity, the public official must first prove that she was acting within the scope of her discretionary authority when the allegedly wrongful acts occurred. *Lee*, 284 F.3d at 1194.  Discretionary authority encompasses those acts that fall within an employee's job responsibilities. *Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).  Here, Herring argues that she was acting within the course and scope of her discretionary authority when supervising

personnel and monitoring compliance with Board policies and protocols. Doc. 37 at 13. Plaintiffs do not appear to contest this assertion. Doc. 43. Without opposition, the court finds that Herring was acting within her discretionary authority when considering Plaintiffs' complaints of discrimination and monitoring compliance with the Board's policies.

"The burden then shifts to [Earle and Evans] to show that qualified immunity should not apply because: (1) [Herring] violated a constitutional right, and (2) that right was clearly established at the time of the incident." *Garczynski*, 573 F.3d at 1166. "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right. In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (quotation marks and citations omitted). Here, Earle and Evans fail at the first prong because they have not demonstrated that Herring violated their constitutional rights. Earle and Evans allege that Herring violated their right to equal protection under the Fourteenth Amendment. Doc. 11. But, as established above, Earle and Evans do not have a valid claim under the Fourteenth Amendment because they have not proffered a proper comparator. Thus, without a violation of a constitutional right, Earle and Evans cannot show that Herring is not entitled to qualified immunity. *See Gonzalez v. Reno*, 325 F.3d 1228, 1236 (11th Cir. 2003) ("Because plaintiffs have failed to

allege that the supervisory defendants' conduct constituted a constitutional violation, the supervisory defendants are entitled to qualified immunity under the first step in our qualified immunity analysis."). The court concludes that Herring is entitled to qualified immunity for the claims against her in her individual capacity.

## D.     Prospective Injunctive Relief

In their amended complaint, Earle and Evans request a "permanent injunction enjoining the Defendants, their agents, successors, employees, attorneys and those acting in concert with Defendants and at Defendants' request from continuing to violate Title VII, § 1983, § 1981, and the Fourteenth Amendment." Doc. 11 at 11. A plaintiff may seek prospective relief against state officers to end ongoing violations of federal law. *See Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1336 (11th Cir. 1999). But these plaintiffs' alleged violation is no longer continuing. *See Pryor*, 180 F.3d at 1337 (holding that "the *Ex parte Young* doctrine applies only to ongoing and continuous violations of federal law" and "a plaintiff may not use the doctrine to adjudicate the legality of past conduct"). Smith's salary was reduced on November 26, 2018, and he resigned on January 1, 2019. Doc. 35-8 at 6 & 38. Moreover, Plaintiffs have conceded that prospective injunctive relief is not available. Doc. 43 at 20. Accordingly, the request for an injunction is due to be denied.

## V.  CONCLUSION

For these reasons, it is ORDERED that the Motions for Summary Judgment

(Docs. 33 & 36) are GRANTED and that all claims in this action are DISMISSED with prejudice. A final judgment will be entered separately.

DONE and ORDERED on January 29, 2020.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE